## BOVEY–SHUTE LUMBER COMPANY, a Corporation, v. C. E. LIND.

### (151 N. W. 16.)

**Evidence — agent — scope of authority — contract — sale of goods.**

   1. Evidence examined, and, *held* that the agent of the plaintiff company made an agreement within the scope of his authority, whereby defendant was to have a 25 per cent discount from list prices upon the goods brought by him from plaintiff.

**Agreement — ratification — evidence of.**

   2. The evidence further shows a ratification of such agreement by the officers of the company.

Opinion filed January 18, 1915.   Rehearing denied February 10, 1915.

Appeal from the District Court of Benson County, *Leighton,* J. Affirmed.

*R. A. Stewart (Miller & Zuger,* of counsel) for appellant.

There was no consideration shown for the alleged agreement for 25 per cent discount after defendant had taken the materials and charged same to himself at the going prices, as it was due and owing to the plaintiff already by defendant's own acts of acknowledgment. Whiffen v. Hollister, 12 S. D. 68, 80 N. W. 156; Fletcher Bros. v. Nelson, 6 N. D. 94, 69 N. W. 53; Gaar, S. & Co. v. Green, 6 N. D. 48, 68 N. W. 318; McArthur v. Dryden, 6 N. D. 438, 71 N. W. 125; Chilson v. Bank of Fairmount, 9 N. D. 96, 81 N. W. 33; Roberts v. First Nat. Bank, 8 N. D. 474, 79 N. W. 993; Barrington v. Ryder, 119 Iowa, 121, 93 N. W. 56; McNerny v. Hubbard, 3 Neb. (Unof.) 108, 93 N. W. 1125; Martinson v. Marzolf, 15 N. D. 474, 108 N. W. 801; Silander v. Gronna, 15 N. D. 552, 125 Am. St. Rep. 616, 108 N. W. 544; Runkle v. Kettering, 127 Iowa, 6, 102 N. W. 142; Trombley v. Klersy, 141 Mich. 73, 104 N. W. 419; First Nat. Bank

v. Lehnhoff, 77 Neb. 303, 109 N. W. 164, 112 N. W. 563; Ryan v. Dockery, 134 Wis. 431, 15 L.R.A.(N.S.) 491, 126 Am. St. Rep. 1025, 114 N. W. 820; Rev. Codes 1905, §§ 5316–5326.

*R. Goer,* for respondent.

When the belief of the authority of an agent arises only from his previous actions as an agent, the person treating with him must, on his own responsibility, ascertain the nature and extent of his previous employment. Corey v. Hunter, 10 N. D. 5, 84 N. W. 570; Nichols & S. Co. v. Stangler, 7 N. D. 102, 72 N. W. 1089.

A finding of the trial court in a law action, supported by evidence, must be given the weight of a verdict of the jury. Wolf v. Ranck, 161 Iowa, 1, 141 N. W. 442; Plewa v. St. Josaphat's Congregation, 153 Wis. 276, 141 N. W. 267; Independent Pub. Co. v. Stanley County, 31 S. D. 483, 141 N. W. 366; Kroeger v. Warren, 31 S. D. 480, 141 N. W. 395; State ex rel. Rice v. Chicago, M. & P. S. R. Co. 31 S. D. 547, 141 N. W. 473; Evans v. Evans, 159 Iowa, 338, 140 N. W. 801; Reed v. Boland, 31 S. D. 309, 140 N. W. 691.

BURKE, J. Plaintiff is a corporation in the general lumber business, having a line of yards in this state, one of which is at Warwick, and was managed by the defendant Lind during the times hereinafter mentioned. Between July and November, 1911, defendant built a house in the village, taking the lumber from his yard and charging himself therewith at list prices. Every day, or at least twice a week, statements of the business done at the yards were forwarded to the company. It seems to have been understood that agents of the plaintiff company should receive a discount, at least for cash purchases made by themselves. Plaintiff's traveling auditor, Jackson, went to Warwick during that month and had a conversation with defendant relative thereto. This conversation was in the presence of Mrs. Lind, and the three persons interested have given their recollection of this conversation. Jackson says: "I was going over the books at Warwick, when I saw this account which I had not seen before, and I asked Lind what it was, and how he happened to have charged so much material to himself. He replied that he had taken it out to build a house. I asked him if he had obtained the consent of anyone in authority to sell this material to himself, and he replied that he had not done so, but that he was intending to do so, and he said that he was

also intending to find out if an arrangement could be made for allowing him a reasonable discount on the bill for cash. . . . I told him I could make no arrangement for allowing him a discount on the bill, and I did not know whether the company would under the circumstances; that if he wanted to find out further about discounts, he should take the matter up with Mr. Bovey direct by letter, which he said he would do. . . . I asked him by whose authority he had taken material and how he intended to pay for it. He said that he expected to pay for it out of the proceeds of his crop that fall, and he further stated that he would put a mortgage on his farm if the crop was not sufficient to pay for it."

Mr. Lind, upon his part, testifies:

Q. Prior to getting this stuff, you did not write to the company and ask them whether you could have it or not?

A. I spoke to the superintendent.

Q. Mr. Taylor?

A. Mr. Taylor. It was quite a time before Mr. Bovey—

Q. He is a traveling auditor of the company?

A. Mr. Bovey was there himself quite a while before I built and Mr. Taylor says—

Q. I just asked you a question and you have not answered it, you see.

A. All right.

Q. And you made the entries on your yard sheet, as you bought the material, didn't you?

A. Yes, sir.

Q. And had you forwarded any of those to the company prior to the time Mr. Jackson came out?

A. Yes, sir, a report going in every day—every week anyway—twice a week.

. . .

Q. Now was it their custom to allow discounts when they carried a man on an account—open account—that way?

A. Yes, sir.

Q. All persons?

A. All? No, not all persons, but—

. . .

Q. And you say that Mr. Jackson told you in that conversation that you should have a discount of 25 per cent?

A. Yes, sir.

Q. And that was the words he used?

A. Yes, sir.

Mrs. Lind testifies:

Q. You may state, Mrs. Lind, if you were in the office of the Bovey-Shute Lumber Company at Warwick on or about September 20, 1911?

A. Yes, I was in the back there.

Q. You lived in the office at that time, didn't you?

A. Yes, we lived there.

. . .

Q. You may state now, Mrs. Lind, whether or not at that time and in that conversation you heard Mr. Jackson tell your husband that he would allow him a discount of 25—any amount—on certain material that your husband had purchased from the plaintiff?

A. Yes, I did.

Q. You may go on now and state the circumstances of the conversation as you remember it.

. . .

A. Now they were going through the ledger, and Mr. Jackson asked Mr. Lind—as they were going through the accounts Mr. Jackson said, "I suppose you want to be carried," and Mr. Lind said, 'Yes,' he thought he would have to be on account of the failure of. the crop, and so it went further and Mr. Lind wanted to know about the discount, and Mr. Jackson told him that it wouldn't be more than right for him to have it at cost, but that it cost some to run the yard; and then he asked him if 25 per cent discount. would be all right, and Mr. Lind said 'Yes,' and they agreed on it.

There were also introduced in evidence certain letters from which we quote. The first is dated February 1, 1912, written by Lind to the company. ". . . Yours of the 20th at hand, regarding my lumber bill. Would you be satisfied with real estate security and allow me my discount until December 1, 1912. . . :" And, in answer from the company, dated February 6, 1912: "Answering yours

of February 1st with regard to your account, will say that it is really out of the question for us to carry this until next fall. . . . We saw that you were taking out this material, and inasmuch as you said nothing about any arrangements for time, we took it for granted that it was a cash deal. . . . We will allow you a proper discount for cash, but we must have cash settlement at once. . . ." Other correspondence followed, a summary of which is given in a letter written by Mr. Bovey, the president of the plaintiff corporation, in January 2, 1913, which we reproduce in full later. In the meantime, plaintiff had raised $300 upon a mortgage upon one of his farms and had assigned portions of his salary to the company, so that if he were allowed the discount before mentioned, his account would be fully paid in October, 1912. Upon writing to the company to this effect, he received the following letter, January 2, 1913, written as aforesaid by the president of the company.

Mr. C. E. Lind,
    Bovey–Shute Lumber Co., Warwick, N. D.
Dear Sir:—

I have yours of December 29th, and note all you say about your account. Now, in this connection would call your attention to the following quotations from letters which we have written you repeatedly regarding this account. I have looked up all this correspondence and want to call your attention to what the General Office has told you regarding your account.

Under date of January 30, 1912, which would be about eleven months ago, we wrote you as follows:

"We cannot agree to carry this account much longer, but if you will settle within the next thirty days, we will give you a reasonable discount for cash." You replied to this on February 1st, offering a real estate mortgage if we would carry it until the next fall. To this we replied that it would be out of the question for us to carry this until fall. In this letter we also state that we will give you a proper discount for cash, but must have the cash settlement at once. This letter is dated February 6th, 1912. On February 12th you wrote in that you would be able to pay us by March 1st and on February 23d we wrote you, reminding you that there was only a week left before

March 1st, and asking if you were going to be able to pay. We also stated that we could not carry the account any longer than March 1st. We again wrote you on March 5th, stating that if you expected to get a discount on your bill you would have to settle pretty soon, and we also said that the time would soon be up during which we could afford to allow any discount on last year's business.

On the 6th of April we wrote you offering to take out a mortgage on your farm and furnish you the money so that you could settle our account. Nothing was ever done about this, so far as we know.

On April 29th you stated in a letter that you were going to get $600 and would give us $300 out of it. This $300 you did pay down on your account. It was many months after your time for discount had expired.

Now, Shorty, the fact is this: that no one could let an account run as long as yours has and put us to so much trouble and expense and still expect to get his discount. You know as well as we do that discounts are allowed on certain terms, either where an agent needs a house and comes to us frankly and tells us so, and making arrangements whereby he is to pay so much out of his salary each month after having made a substantial cash payment in advance. On a deal of this kind, we allow a discount, or we will allow discount for cash to any customer and a larger cash discount to our own agents; but your account has run along so long that we can't possibly allow a discount.

This is a trial *de novo* in this court, the only dispute being as to whether or not the defendant is entitled to a 25 per cent discount, it being agreed that if such discount is allowed, defendant owes nothing to the plaintiff, and that if it is not allowed, his indebtedness will be the sum of $140, for which a lien was later filed.

(1) We have not set out all of the testimony, but think we have given sufficient extracts to justify the conclusion which we have reached, to wit: That Mr. Jackson made an agreement with the defendant, whereby he was to have the discount, and that the agreement was ratified by the company. Appellant states that he relies for a reversal upon two propositions. First, that Jackson did not agree to the 25 per cent discount; and, second, that if he did, he was without authority to make such an agreement. To the first question, we have

to say, as above, that we think the preponderance of the evidence is in favor of the version given by the defendant, and we are particularly impressed with the probability of the testimony given by Mrs. Lind.

(2) As to the second proposition, it is sufficient to say that the letters of the president of the company show either a ratification of the conversation had by Mr. Jackson, or else of an understanding from some source that a discount should be allowed. As late as March 5th, some six months after the purchase of the lumber, the president of the company wrote that if defendant expected to get a discount on his bill, he would have to settle pretty soon. Some six weeks later $300 was paid, and under the assignment of salary arrangement, the entire bill was paid within five months more. In our opinion, this was such a ratification of the conversation which we have already held occurred between Jackson and defendant as would support the same as a contract. Therefore, we adopt the findings and conclusions of the trial court in this matter to the effect that the debt was fully paid and that the lien should be discharged of record.

Judgment affirmed.